Filed 9/21/16  P. v. Mundell CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DAVID CHRISTOPHER MUNDELL,<br><br>Defendant and Appellant. | C075768<br><br>(Super. Ct. No. 12F01017) |

Sentenced to state prison after violating probation, defendant David Christopher Mundell contends (1) no substantial evidence supported the trial court's finding that he willfully failed to participate in counseling and (2) trial counsel was ineffective in failing to seek writ review after his motion to disqualify the trial judge was denied.  We affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

In February 2012, a felony complaint charged defendant with three counts of lewd and lascivious acts with a child under 14 (counts one through three; Pen. Code, § 288, subd. (a))[1] and two counts of lewd and lascivious acts with a child of 14 (counts four & five; § 288, subd. (c)(1)). Defendant pleaded no contest to count four in return for a grant of five years of formal probation, including 365 days in county jail. The remaining charges were dismissed in the interest of justice.

The factual basis for the plea, as stated in open court, was that on or about and between January 8, 2012, and February 4, 2012, in Sacramento County, defendant had sexual intercourse with Samantha Doe, a child of 14 at least 10 years younger than defendant.

The probation report stated that defendant, aged 24, told police officers: "The girl across the street is my girlfriend. She is 14 and I have been with her in an intimate relationship." The victim's father, who had known defendant since defendant was a child, had been unaware of the year-long relationship until that day. Samantha Doe told the police she loved defendant; they had had sexual intercourse no less than 50 times, beginning when she was 13, and had also tried oral and anal sex. Defendant said he had wanted to wait until she turned 18, but she persisted and they fell in love; he intended to marry her someday. He did not think they had done anything wrong.

The probation report summarized a psychological evaluation of defendant by Janice Nakagawa, Ph.D. Dr. Nakagawa concluded defendant tended to blame other people or circumstances for his problems. He displayed manipulative and deceptive characteristics and distorted objective reality to suit his own perspective, indicating severe narcissistic personality disorder. He was unlikely to take responsibility for his

---

[1]     Undesignated statutory references are to the Penal Code.

actions or to admit psychological difficulties. In Dr. Nakagawa's opinion, he was unsuitable for probation because he would not be amenable to treatment, especially for child molestation.

In June 2012, Judge Tami Bogert suspended imposition of judgment and sentence and granted probation on the previously agreed terms. The conditions of probation included: "The defendant shall seek and obtain professional counseling through and under the direction of the Probation Officer. [¶] Defendant shall participate in a program of professional counseling as directed by the Probation Officer through the Sacramento Child and Family Institute."

In December 2012, the probation officer filed a progress report, stating that defendant was participating in the sex offender management program with licensed clinical social worker Gary Nichols.

The probation officer's next progress report, filed July 10, 2013, stated that in April defendant claimed he had financial problems and could not resume counseling until his payments were current. He had recently been employed but was fired within a week. He "struggle[d] with making Sex Offender counseling a priority"; he complained that the therapist was interested only in payment and "criticizing [defendant's] prior behaviors."

On July 30, 2013, the probation officer filed a petition for violation of probation, alleging that since April 10, 2013, defendant had failed to participate in sex offender counseling.

On August 23, 2013, at a probation violation hearing before Judge Eugene Balonon, defendant admitted the allegation.[2] The parties stipulated that in three months, when the next progress report would be filed, defendant would have to have completed

_____

[2] The prosecutor noted that Judge Bogert had requested progress reports and asked that any violation or modification of probation go to her, but she had since been assigned to a different courtroom.

3

three counseling sessions.  The prosecutor stated that defendant now had a counseling schedule of less than once a week because of his employment situation, but had to comply with whatever directives the probation officer gave him.

Defendant said no one had been able to explain the counseling requirements and guidelines to him.  Judge Balonon replied that he could not give any information or advice on that topic.

Judge Balonon found defendant in violation of probation, revoked his probation, and reinstated it.[3]  Judge Balonon reminded defendant to bring proof of attendance to the next court hearing, scheduled for November 21, 2013.

On November 21, 2013, defendant admitted he did not have proof of attendance, but claimed he had attended the required meetings.  He also claimed he did not know he had to bring documentation because he thought the probation officer would "write a summary" for the trial court.  Judge Balonon tentatively put the matter over to November 25 and reminded defendant that he would have to "bring the proof [of attendance] to Court with you" unless the court received it before that date from probation.

The progress report filed November 25, 2013, stated in part:  "On October 4, 2013, the defendant was seen by Gary Nichols at which time his demeanor was angry and defensive.  On October 29, 2013, the defendant appeared for a follow up appointment at which time his demeanor was defensive and [he] blamed others for him being there.  The defendant left the session without completing it.  The defendant did not return to Mr. Nichols for his [third] session. . . .  [¶]  On November 18, 2013, the defendant met with Liz Horrillo [*sic*; Horillo] at Sacramento Prevention Program for an intake/assessment.

---

**3**     Judge Balonon stated that probation had been revoked previously by another judge (not Judge Bogert).  The record does not show when or whether defendant's probation was previously revoked.

The intake is not considered a counseling session as it is just an assessment for the provider to see where the client's needs are best met."

Nichols's attached report stated: "I began seeing [defendant] for individual court ordered sex offender counseling in Oct 2012. He kept 4 initial appointments and stopped attending. He was again seen on 10/4/13, after he was directed by the Court to participate in 3 individual sessions with this writer. His demeanor during the 10/4/13 appointment was defensive and angry. He felt probation was demanding and aggressive towards him. He felt he was unable to satisfy any of the probation requirements as his probation officer was never happy with what he was doing. He said he had a job, [was] attending school and had an acting role set up. He said he was inappropriately arrested and he lost every thing [*sic*] he had worked towards. At the end of this session he was urged to stop blaming his PO for his problems, to stop feeling victimized and to begin looking at what he has done and continues to do that contributes to the difficulties he experiences. [¶] The follow up appointment was scheduled for 10/29/13. He began blaming his PO for numerous issues and this writer again suggested he not blame her but to look at his behavior that got him into his current legal status. He was unable to do so. He stated his PO was not going to let him succeed. He stated he was in love with the young woman that he was involved with, stating he had no control over who he fell in love with. I offered he might be right about his feelings but that as adults we are supposed to have control over what we do with feelings. When I urged him to work on his issues, he said he did not have any problems to deal with. When asked why he was in my office, he said his Public Defender set him up. When I said stop blaming, he got up and left the office. He did not complete 3 appointments. It seems to this writer that [defendant] is not interested in any counseling services at this time. He feels he is being treated unfairly by his PO and others, denies doing anything wrong, either the instant offen[s]e, when he was recently arrested and jailed[,] or currently. He is not ready to address any personal issues or concerns with this writer or perhaps with any other therapist."

5

At the hearing on November 25, 2013, defendant said: "I'm in a program with Christina Barrett [*sic*; Benefit] and her partner Elizabeth. I don't recall her name. But we are still kind of confused about the schedule because I'm not—the counseling sessions with them is now double the price of the previous counselor I was seeing. And I'm still—I barely met the three that the Court had assigned me."

The prosecutor announced that she would file a violation of probation.

Judge Balonon told defendant (then in pro se) the court would appoint an attorney for him and set a probation violation hearing.

Defendant insisted he had complied with his probation conditions as far as possible, given his lack of income or assistance in finding work. He asserted that Nichols "was going to have a slant[ed] perspective because . . . basically our last session, he flipped out on me and didn't like my attitude." Furthermore, "he basically threatened me and said that if I don't basically have the money for him on a weekly basis that he's going to write me a bad report. I guess this is it. And that he's going to do something . . . that I'm not going to like that most likely is going to get me ended up back in prison. That's why I opted for another counselor."

Judge Balonon remarked that Nichols appeared to be confirming Dr. Nakagawa's finding that defendant was not amenable to treatment.

Defendant said: "Your Honor, before I had seen the Court on a two to three months basis, and I kept getting continuances, I was told that possibly the judge I was seeing could revise my probation or possibly work out so that I don't have to attend weekly because I don't have any way to afford this. [¶] And I have prospects, job prospects coming in. But when I'm fresh out of jail, I had a job before. The probation officer] acted kind of prematurely, incarcerated me. [¶] I lost my job. I had to fail two classes. I now owe the Federal Financial Aid Institution an extra $700 because of those classes. She literally booked me two days before finals. Some of that money I was using for counseling. Because honestly, finding work is . . . not as easy as everybody seems to

think it is especially when you have my charge. [¶] So I'm trying. I met the minimum that you had set for me a few months ago. And I'm trying to maintain. But for me to commit to a weekly session that's not $90 as well as paying for rent, food and trying to contribute to wherever I'm staying--I'm trying, your Honor. [¶] It is not that I'm not taking responsibility because if that was the fact I would have never admitted guilty in the first place."

Judge Balonon remanded defendant to custody, stated that he would appoint the public defender to represent defendant, and reset the matter for arraignment on violation of probation. The prosecutor asked: "Your Honor, are we coming back [to] this courtroom or VOP court?" Judge Balonon replied: "You might as well come back here."

On December 3, 2013, the People filed a petition for violation of probation, alleging (1) defendant failed to participate in sex offender counseling as ordered by the trial court and as directed by the probation officer, and (2) defendant violated the trial court's order of August 23, 2013 to complete three counseling sessions by November 21, 2013.

At a hearing on December 5, 2013, defendant was represented by retained counsel. Counsel requested own-recognizance (OR) release, asserting that at the last hearing defendant had proved compliance with the counseling condition.[4] A long colloquy on this point ensued.

Judge Balonon stated that an intake session did not count as counseling. Counsel asserted that it should count because the counselor "had to discuss his life and his situation and counseling with [defendant]."

---

[4]     According to counsel, defendant proved that "he attended four different sessions, two of which were intakes," and "when things didn't work out with the current counselor, he went out and got another counselor which is all the Court could ask him to do."

7

Judge Balonon stated: "Since we're talking about an OR here, looking at the background of this case—and I went all the way back to reading the psych[] report by Dr. Nakagawa. She actually recommended against probation because she didn't feel that he would participate in counseling . . . . [T]his started off as a non-probationary mandatory state prison case [under section 288, subdivision (a)] . . . . The only way that he could qualify for probation in these set of facts is by . . . pleading to the [section] 288(c). . . . [¶] . . . [T]hat was about a year and a half ago and all I asked him to do was complete three counseling sessions of the counseling that he's required to do and he—I don't even know that based upon what I've read here that he's done even two. . . . It reads as if he has done nothing in the way of counseling with Mr. Nichols because during the entire time that he's engaged with Mr. Nichols, he's blaming the probation officer for all these problems. He talks about how he doesn't need counseling. And Mr. Nichols ends this report that's attached to the status report from probation . . . by saying [defendant's] not ready to address any personal issues or concerns with Ms. Ryder [*sic*; this writer] or perhaps with any other therapist."

Counsel replied that Nichols was "throwing [defendant] under the bus" because defendant had left him and found another counselor, depriving Nichols of income. Counsel asserted that the court should say: " 'You know what, [defendant]? I appreciate that it didn't work out with that counselor and you went with somebody else.' "

Judge Balonon stated: "But working out is somebody engaging in counseling, wanting to do counseling. . . . Mr. Nichols says your client stated he was in love with a young woman—and she's not a young woman. . . . [S]he was 13 when they had this relationship. And I see your client looking down shaking his head. And he says he has no control over who he fell in love with. I mean, she's 13. He's at least 10 years older than her at that time. Then he continues this relationship."

8

Counsel suggested that attending multiple counseling sessions before the hearing could be made a condition of OR release: "The idea is to help the man, to help him get help . . . ."

Judge Balonon stated: "My attitude is [that] you can't help anybody unless they want to be helped. I don't get the impression he wants to be helped because he doesn't think he needs any help."

After Judge Balonon formally denied defendant's OR request, counsel asked where the probation violation hearing would be set. The prosecutor said: "It will be in here." Counsel asked: "How is it set in here? Is it in his court for all purposes? We never agreed to that." Judge Balonon replied: "It was set for him to show me proof. He didn't show me proof so I'm keeping the case." Counsel asked: "Based on what authority? [¶] . . . You're not the VOP hearing judge." Judge Balonon answered that he was not the VOP hearing judge when it came to him in the first place. The prosecutor said: "It was assigned here for the purposes of a VOP . . . . [¶] . . . And it's been here ever since." Judge Balonon stated: "I'm going to hear it . . . ."

Counsel stated: "Well, you're alleging you're going to hear it. I'm going to file a motion and I'm going to file a [Code Civ. Proc., §] 170.6 or a 170.1."

The hearing was set for December 13, 2013.

Counsel stated: "And just so I'm clear, the Court is saying that because it's hearing—it's receiving the progress report of [defendant], it has authority to handle the VOP hearing?" Judge Balonon replied: "I assigned it to myself because I've had the case when you first came in here for the VOP hearing in the first place—the first time the violation was filed." Counsel asked: "So you keep it for all intents and purposes?" Judge Balonon replied: "I'm just retaining this case."

On December 13, 2013, defendant's counsel executed a document headed "Peremptory Challenge (CCP 170.6)," declaring that Judge Balonon was prejudiced

9

against defendant or counsel. The copy of this document in the record is not file-stamped.

The record does not contain a transcript of the hearing held on December 13, 2013, but the minute order states: "The Court declined to accept Defendant's Peremptory Challenge pursuant to CCP 170.6 as untimely." The minute order also states that Judge Balonon granted defendant's request for continuance over the People's objection.

Judge Balonon held a hearing on the petition to violate probation on December 20, 2013. Cynthia Soloman, a Sacramento County probation officer, counselor Nichols, and defendant testified.

Soloman, defendant's probation officer from the beginning "on and off for probably a year," testified that he had not attended counseling "[o]n a regular basis" or complied with her directions as to counseling.[5] She had directed him to contact counselors from a list she gave him, and to "set up an assessment and participate in the counseling thereafter."[6] If he said he had not been going, she would tell him he needed to start or he would be back in court. Such conversations had happened repeatedly over the past nine or 10 months. In April 2013, defendant was warned that counseling had to be his highest priority and he risked a probation violation by not attending.

Soloman thought "attend counseling as directed by [the probation officer]" would normally mean going once a week, because that is the typical schedule for counselors, and reporting to her that he had gone. Soloman once ordered defendant to attend weekly,

---

[5]    Probation Officer Hinojosa had supervised defendant for an unknown period. Soloman's file on defendant contained no notes by Hinojosa.

[6]    Soloman gave defendant the list on August 24, 2012, and again on November 6, 2013, after he told her he had walked out of an appointment with Nichols. She made it clear that he had to complete a counseling program with a provider on the list. Before seeing Nichols, defendant saw one other such provider in October 2012 for a single intake session, then did not keep a second scheduled appointment.

10

but changed the order to accommodate his financial problems; at that point, his schedule was between him and his counselor (Nichols). She followed up with Nichols and believed he and defendant had agreed, well before the August 2013 court order, on a once-a-month schedule.

Defendant sometimes said he could not afford counseling, but he also said it should not have been ordered because he did not need it and could not help with whom he had fallen in love. She told him other probationers with financial hardships collect aluminum cans to afford counseling. Once he said he could earn money by cage fighting or acting; she said if he got paid for cage fighting he could pay for counseling.[7]

Visiting defendant's home in February 2013, Soloman saw a car; he told her he bought it. She asked how he could afford it if he had no income, but did not recall his answer. In September 2013, Soloman saw a different car at defendant's residence; she was told it was his car.

Defendant told Soloman at some point he had an orientation scheduled for food preparation at Pizza Hut, but he also told her he did not make the first session. In June 2013, defendant reported he was employed at Bradshaw Feed Store for a week, but was terminated.

Soloman never told defendant she would furnish proof to the trial court that he attended three counseling sessions between August 23, 2013, and November 21, 2013. She told him it was his responsibility to do so. He never showed her any such proof.

Elizabeth Horillo confirmed by e-mail that defendant had an intake/assessment meeting with her. Soloman believed the e-mail said Horillo and defendant had discussed "his charge." Soloman did not ask Horillo to prepare a report because Soloman had already submitted her memo to the trial court and defendant's court date had been set.

---

[7] Defendant once asked permission to go out of state to take part in a cage fight, but did not show her proof that he was scheduled to fight.

Soloman did not discuss the meeting with defendant because she did not find out it had occurred until after he was in custody. She did not know whether defendant had future appointments set up with Horillo.

Benefit, Horillo's officemate, told Soloman that at an intake or assessment, paperwork is filled out and the defendant's offense may be discussed. It does not count as a therapy session.

Gary Nichols, a licensed sex offender counselor, had been on the probation department's referral list of counselors for 30 years. According to Nichols, participation in counseling meant "regular scheduled appointments, being active and engaged in the sessions, participating, paying the fee for those services." Ordinarily a client would pay at the end of a session, but a full hour of counseling would count as a session even without immediate payment.

Defendant complained about finances all along, but initially said he would pay through student loans. Later he said he stopped attending because he had no money. Nichols tried to work with him by spreading the initial appointments out over a six-month period, even though he normally saw clients once a week.

Between October 2012 and late March 2013, defendant completed four sessions with Nichols, which in his view constituted compliance with defendant's counseling condition even though the sessions were introductory and mainly about trying to establish rapport. Nichols then did not see defendant for several months.

Nichols saw defendant again on October 4 and October 29, 2013. He was "defensive" and did not like the idea he had to be there. "[H]e didn't see himself as having any issues to deal with, that he was being forced to participate in this. And he generally felt like he didn't have any problems to address." In his view, "he had done no wrong. . . . [H]e was in love with this young woman that he was with, and [the] charges against him were generally inappropriate."

Defendant felt probation had caused him to miss out on school and employment. He "[f]requently" blamed his probation officer for his failure to comply. At the October 2013 sessions, Nichols wanted him to face his current problems, but he wanted to talk only about his displeasure with probation. He never took responsibility for the actions that had led him to this point.

On October 29, when Nichols told defendant to stop complaining about probation and take a look at his own behavior, defendant got up and left after 30 minutes, halfway through the session. He never returned.

In Nichols's opinion, defendant was not interested in counseling or ready to address his personal problems there. Nichols based his opinion on the infrequency of defendant's attendance, including the six-month lapse with no contact, and defendant's desire to blame others for his current status rather than to accept responsibility for his own well-being. The fact he had an intake session with another counselor did not change Nichols's opinion.

Defendant testified that on release from custody he obtained a job at Bradshaw Feed Store after six months and multiple applications. After a week, his vehicle "just broke" and he lost the job.[8] He eventually got another vehicle with help from family and friends. He did not buy any new vehicles.[9]

---

[8] According to defendant, when he called the store to report his car trouble, he was told if he could not make it in within the next two hours, he would be replaced. He did not have a cell phone. He walked home so that he could get his car moved off the side of the road before it was towed; he did not go to the store.

[9] A few months after he was released from custody, defendant's grandmother bought a Mustang for him for $1,000. Defendant testified at his violation of probation hearing in January 2014, that the Mustang broke down four months prior. He was then driving a Honda that belonged to his uncle, which had been lent to him to try to find work and go to school. He also drove Hondas belonging to his brother and his friend "John" (Albert Rivera), who paid for defendant's attorney.

"[M]aybe two, three months" after losing the feed store job, and after 50 more job applications, defendant was hired at Pizza Hut. That job lasted about two weeks before he was "violated" by his probation officer. He tried to go back there, but they would not take him back.

Defendant earned a little income from helping family members before and after the feed store job. Before getting the job he accumulated approximately $10,000 in debt, including loans from family and friends. A friend was paying defendant's attorney.

Within a month after defendant's release from custody, he saw counselor Evan Sunby, but did not return because Sunby called him a pedophile, child molester, and threat to society. Every other counselor on the probation officer's list besides Nichols was too busy or "overpriced." Defendant chose Nichols because "[h]e was cheap."

Defendant used financial aid from Cosumnes River College, where he was enrolled, to help pay for sessions with Nichols, but he did not receive the money immediately, and some went to help his ailing father pay rent. Therefore, he could not meet Nichols's schedule of six sessions per month.

After the court order to do three sessions in three months, defendant immediately scheduled an appointment with Nichols. The first session was "okay." But at the second session, after defendant said he could not afford weekly sessions, Nichols replied that if defendant did not come in once a week, Nichols would write a bad report.[10] Although "stunned" by this threat, defendant went on with the session.

When Nichols asked about defendant's plans, he said he could not talk much about them because he did not have a "positive outlook:" he might be "violated" any time, he

---

**10** On cross-examination, defendant clarified that Nichols did not threaten to write a bad report if defendant "couldn't" attend weekly, but only "if [he] was not attending by January."

14

had lost his job and gotten another "F" at school, and his car's transmission had just "blown." Nichols did not like that response.

Halfway through the session, defendant felt that "Mr. Nichols kept denying [him] the right to feel confused" about "what [he was] doing [there] and how [he was] going to pay [Nichols] and maintain these sessions." Claiming that defendant was trying to portray himself as the victim, Nichols got irritated, said he could not understand how defendant could have had a relationship with a 14-year-old girl, and would not listen to defendant's "explanations" or "defenses." Nichols started yelling and getting out of his seat; his "really unprofessional" behavior suggested an imminent assault. At that point, 45 or 50 minutes into the session, defendant walked out to avoid an altercation.

Nichols's report to the probation officer was inaccurate. Defendant did not become defensive and angry: Nichols did. Defendant did not say his probation officer had a vendetta against him; he merely explained that her last violation of him had adversely affected his employment, education, and ability to attend sessions.[11] Defendant never told Nichols that the probation officer was not letting defendant succeed. Defendant did say, however, that she was difficult to work with at times and that she violated him prematurely. He felt she had unfairly denied him the opportunity to go to Nevada to compete in a cage fight. He also requested, to no avail, that his ankle monitor be removed so that he could properly train for the cage fight but yet still remain in Sacramento.

Having decided to get another counselor, defendant asked Soloman for another list. She circled a name and said she could probably get defendant in to see that person before his court date. The "person" was Benefit and Horillo, who work together.

---

[11] During the six months Probation Officer Hinojosa supervised defendant, he had no probation violations.

15

Defendant had one session there about a week before his court date; he scheduled another a week later, but was remanded into custody by then.

Defendant attempted to complete three counseling sessions after the court order. He attended three different appointments with counselors during that time; the first and third lasted an hour, the second about 45 minutes.

Defendant lived for a while with his father, who was now in a convalescent home and did not have any money. He also lived for a while with his grandmother, doing chores but not paying rent or board. He asked her for money for counseling, but "we don't have money like that;" however, she did pay for his first session. His friend Albert Rivera paid for two sessions. At some point, defendant had "a falling out" with his family.

Defendant thought his four sessions with Nichols in 2012 were just intake sessions; all they really talked about was how defendant would be able to pay. At the end of the last two sessions, Nichols asked about defendant's case, but then immediately said, "time is up." Defendant stopped going because he felt Nichols did not care about him and his situation. He hoped to find a different counselor, but since the others he contacted declined to see him, he had to go back to Nichols.

Defendant did not understand why he was ordered into counseling if his psychological evaluator had already assessed him as unable to benefit from counseling. He acknowledged that at sentencing he agreed to counseling as a probation condition, but stated, "Honestly everything I said was to get out of there at that time. I was told that if I tried to fight and do anything further that I would be in there for a minimum of another year. So whatever was said I accepted."

Defendant felt the probation officer was "not too aware of what counseling actually entails." Neither the probation officer nor the court was able to explain to him exactly "what the mandate was for counseling." Asked whether the probation officer told

him that going once a week was the norm, defendant replied: "It was whatever the counselor would tell her."

Defendant stated he did not have "a sexual relationship with a 13-year-old," he had "a relationship." He did not consider himself a child molester. Asked if he saw anything wrong with his relationship, he answered: "Honestly over a period of time, I became very fond of the girl. I could say yes. Honestly I do love her." He added: "Is there something wrong with loving a little sister?"

When defendant said in counseling he felt he had done nothing wrong, however, he was not talking about his charges, but about his previous violation of probation. Defendant also talked with Nichols about his perceived problems with his attorney and "certain things that weren't kosher and a little bit of misconduct" as to what happened in the courtroom. Defendant told Nichols he was "not a head case" when it came to "depression or things like that," but they "never had an opportunity to discuss why [he] was there."

Defense counsel asserted the People were attempting to violate defendant's probation again for the prior violation he already admitted (a violation which was questionable in itself because probationers were not normally violated merely for not having written proof of compliance). Counsel further asserted defendant attempted in good faith to comply with the order to attend three counseling sessions in the required time frame, and actually attended three sessions if the session with Horillo was counted (as it should be); if the second session with Nichols was not completed, that was due to Nichols's unprofessional conduct, not to defendant's willful violation of the order.

Judge Balonon ruled:

"[T]he prior violation was for having failed to participate in the . . . counseling program. That was one of the counts. . . .

"I'm just looking at that because of [counsel's] comment here this morning about . . . the propriety of again making the same allegations as before.

17

"But let me just say this. That . . . attending sessions is not the same as completing[,] or attending three meetings as [counsel] has characterized some of his sessions is not the same as completing counseling sessions.

"And I think what's important for the Court to look at, even if I can't necessarily find him in violation for the allegation just generally because it was alleged in the prior case back in July of last year where he admitted it, and then the Court ordered [defendant] to then complete three counseling sessions between that date of the violation which was—he was released on August 23rd or some date close to that of 2013 and then given the date of November 21, 2013, so about three months to come back and provide proof of completion of at least the three counseling sessions.

"So even if I can't consider what had lead [*sic*] up to all of this . . . it is still fair for the Court to make these observations about [defendant]. He was placed on probation . . . back in July or June of 2012. And basically for the almost year and a half . . . after he was placed on probation he completed—maybe I'm going to be generous here eight sessions and I'll throw in even intake sessions.

"I'm counting the intake sessions with . . . Sunby . . . . So that's one. You have four sessions with Mr. Nichols. And that was between a five month period of October 2012 to March 2013. Then you have another session with Mr. Nichols on October 4th, 2013.

"That's the first session that he did when he was released from custody on the violation of probation. So now we are at six. And he did an incomplete session with Mr. Nichols, half. So now we are at six and a half. And then you have another session with Ms. Horillo. Although from the testimony, it appears to be a—not a counseling session but an intake.

"And so just being generous about it, it gets me to about seven and a half sessions total. But I think what's telling about the case is just the statements that [defendant]

18

makes both to his probation officer and to Mr. Nichols and what he said here in court that he doesn't feel he needs counseling.

"I mean, he's not motivated to attend counseling because he doesn't feel he needs it. And he has the opportunity to attend these counseling sessions. He just chooses to use his monies otherwise.

"He . . . talked about . . . us[ing] [his] financial aid to attend these counseling sessions. But he never once used his financial aid to do it. He used monies—because this is what he testified to—he got money from his grandmother one time and then from his benefactor twice. That was it.

"And that's . . . where he used his money. And that is three sessions right there. So I don't understand why he couldn't use his financial aid to do these three sessions that the Court asked him to do for this three months period. He didn't. He didn't do it.

"And he blames Mr. Nichols for this. But I find Mr. Nichols to be credible as compared to [defendant] on what happened here and what lead [*sic*] to their falling out. And it seems to be really [defendant] because he doesn't want to do these sessions. He does not want to be in counseling. He doesn't recognize that what he did was improper.

"And that's showing his lack of motivation here to attend any counseling. He's just not motivated to do it, and he doesn't do it.

"The Court finds that he's not made the reasonable efforts to complete the counseling as it was ordered. And I find that he was in willful violation of his probation by failing to complete these three sessions between the time period of . . . August 23rd, 2013, and November 21, 2103."

Judge Balonon referred the matter to probation for a presentencing report.

At the sentencing hearing on January 30, 2014, Judge Balonon imposed the upper term of three years in state prison, finding that aggravating factors (planning, taking advantage of a position of trust) clearly outweighed mitigating factors (lack of a criminal record, early acknowledgment of wrongdoing).

19

DISCUSSION

I

Defendant contends there is no substantial evidence he willfully failed to participate in counseling as directed or willfully failed to complete three sessions within the period covered by the trial court's order of August 23, 2013. We disagree.

At a hearing to revoke probation, the facts sufficient to prove a willful violation of the terms and conditions of probation must be proved by a preponderance of the evidence. (*People v. Rodriguez* (1990) 51 Cal.3d 437, 440-441.)

If the defendant claims on appeal that insufficient evidence supported the trial court's finding, we decide the question under the substantial evidence standard of review, examining the evidence in the light most favorable to the court's ruling and resolving conflicting inferences in its favor; in particular, we do not reweigh the court's findings as to witnesses' credibility. (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)

The trial court expressly found that Nichols's testimony that defendant did not complete even two counseling sessions with Nichols between August 23, 2013, and November 21, 2013, and failed to complete the required three sessions because he did not want to engage in counseling or think he needed it, was more credible than defendant's conflicting testimony on those points. By finding expressly that defendant chose not to devote available resources to paying for counseling, the court also impliedly found Soloman more credible on that issue than defendant. We cannot reweigh those credibility findings. Taken together, Nichols's and Soloman's testimony, along with their written reports, was substantial evidence that defendant willfully failed to participate in counseling as directed or to complete the required number of sessions.

But even beyond Nichols's and Soloman's testimony, defendant's own testimony provided substantial evidence that his recalcitrance in the last three months was simply a continuation of the attitude he had held all along. He admitted that at his original sentencing hearing he agreed to counseling only so that he could "get out of there at that

20

time" and not spend another year in custody. Though he pleaded to lewd and lascivious conduct with a 14-year-old, he did not consider himself a child molester and indignantly denied a "sexual relationship" with the victim. As in his statement to the police, when asked if he had done anything wrong he proclaimed that he "became very fond of the girl" and "love[d] her," and audaciously compared his conduct to "loving a little sister." When defendant claimed that Nichols "denied my explanations, my defenses," the trial court could reasonably have inferred that, as in court, so, too, in counseling, defendant adamantly refused to consider he had done wrong or might be a "head case"—in other words, he refused genuinely to participate in counseling and sought only to put on a pro forma show of compliance. That testimony by defendant also lent credibility to Nichols's account of the aborted second session, including Nichols's statement that it ended after 30 minutes (not after the hour was almost up, as defendant said) and therefore could not count as a completed session even on paper.

Defendant asserts the trial court erred by finding that his intake session with Horillo did not count toward completion of the three required sessions. According to defendant, there is no evidence that anyone told him intake sessions did not count, and Nichols testified that he considered defendant's 2012 sessions as in compliance with his counseling probation condition even though they amounted to intake sessions. This point is unavailing. According to Nichols's testimony about the October 2013 sessions, which the trial court credited, defendant unilaterally terminated the second session in midstream; thus, even if the Horillo intake interview is counted, defendant willfully failed to complete three sessions in the time required by the order of August 23, 2013. In any event, the court could reasonably have inferred that since Soloman testified she did not consider intake interviews to be counseling sessions, and Horillo's colleague Benefit told Soloman they were not, Soloman or Horillo or both told defendant such sessions did not count.

Defendant asserts his attempt to seek a new counselor within the time period of the trial court's order, after becoming legitimately dissatisfied with Nichols, proves he did not willfully fail to comply with the order. This contention improperly asks us to view the evidence most favorably to defendant.

Defendant summarizes his own and Nichols's testimony about the second October session, then states: "Regardless of which account is more accurate, it is undisputed that the meeting was at least 30 minutes long and that the therapy session was not productive." When reviewing for substantial evidence, we cannot countenance the suggestion that the account the trial court rejected was "more accurate" than the one the court accepted. In other words, we cannot accept defendant's underlying claim that Nichols lost his temper and behaved unprofessionally (a claim hard to reconcile with his 30 years on the probation department's referral list, and unsupported by anything but defendant's own testimony), or that defendant walked out of that session for any reason besides willful refusal to participate in genuine counseling that might challenge his self-serving rationalizations.

Substantial evidence supported the trial court's finding that defendant willfully failed to complete three counseling sessions after August 23, 2013, as ordered.

II

Defendant contends his trial counsel was ineffective in failing to seek writ review after Judge Balonon denied counsel's disqualification motion as untimely. According to defendant, there was no good reason not to file a writ petition because it was bound to succeed. Furthermore, the failure to obtain writ review of Judge Balonon's order was prejudicial because there is a reasonable probability another judge might have sentenced defendant more leniently. We conclude defendant cannot demonstrate ineffective assistance of counsel on this record.

To win reversal for ineffective assistance of counsel, a defendant must show that trial counsel performed incompetently and that a better result was reasonably likely

22

absent counsel's incompetence. (*People v. Maury* (2003) 30 Cal.4th 342, 389.) Here, defendant cannot show either.

As noted above, defendant's counsel said at the close of the hearing on December 5, 2013, that he would file a motion to disqualify Judge Balonon. Counsel executed a sworn statement under Code of Civil Procedure section 170.6 on December 13, 2013, but the copy of that document in the record is not file-stamped. According to the minute order of the hearing on that date, Judge Balonon declined to accept defendant's peremptory challenge, deeming it untimely.[12] Counsel did not file a petition for writ of mandate to review that ruling.

Code of Civil Procedure section 170.6 provides in part:

"(a)(1) A judge . . . of a superior court of the State of California shall not try a civil or criminal action or special proceeding . . . nor hear any matter therein that involves a contested issue of law or fact when it is established as provided in this section that the judge . . . is prejudiced against a party or attorney . . . appearing in the action or proceeding.

"(2) A party to, or an attorney appearing in, an action or proceeding may establish this prejudice by an oral or written motion without prior notice supported by affidavit or declaration under penalty of perjury, . . . that the judge . . . before whom the action or proceeding is pending, or to whom it is assigned, is prejudiced against a party or attorney . . . . If the judge, other than a judge assigned to the case for all purposes, court commissioner, or referee assigned to, or who is scheduled to try, the cause or hear the matter is known at least 10 days before the date set for trial or hearing, the motion shall

---

**12** As mentioned above, there is no reporter's transcript of the hearing. Defendant moved to augment the appellate record to include a transcript of the proceedings, but the court reporter filed a declaration in this court that she had no notes pertaining to those proceedings.

be made at least 5 days before that date. If directed to the trial of a cause with a master calendar, the motion shall be made to the judge supervising the master calendar not later than the time the cause is assigned for trial. If directed to the trial of a criminal cause that has been assigned to a judge for all purposes, the motion shall be made to the assigned judge or to the presiding judge by a party within 10 days after notice of the all purpose assignment . . . . If the motion is directed to a hearing, other than the trial of a cause, the motion shall be made not later than the commencement of the hearing. In the case of trials or hearings not specifically provided for in this paragraph, the procedure specified herein shall be followed as nearly as possible."

"Unlike disqualification for cause, 'Section 170.6 permits a party to obtain the disqualification of a judge for prejudice, upon a sworn statement, without being required to establish it as a fact to the satisfaction of a judicial body.' (*Barrett v. Superior Court* (1999) 77 Cal.App.4th 1, 4.) 'Where a disqualification motion is timely filed and in proper form, the trial court is bound to accept it without further inquiry.' (*Ibid*.) Disqualification motions made pursuant to section 170.6 are commonly referred to as peremptory challenges. [Citation.]" (*Brown v. American Bicycle Group, LLC* (2014) 224 Cal.App.4th 665, 671.)

Code of Civil Procedure section 170.3, subdivision (d) provides in part: "The determination of the question of the disqualification of a judge is not an appealable order and may be reviewed only by a writ of mandate from the appropriate court of appeal sought only by the parties to the proceeding." The statute means what it says, whether the challenge is for cause or peremptory. (*People v. Panah* (2005) 35 Cal.4th 395, 444.)

Defendant asserts: "Because the 170.6 motion was filed on December 13, 2013, prior to the commencement of the probation violation hearing, it was timely under the general rule that permits a challenge any time before the commencement of a trial or hearing. (Code. Civ. Proc., § 170.6; *People v.*[*Superior Court*] [(*Lavi*)] [(1993)] 4 Cal. 4th [1164,] 1171.)" The record does not support defendant's factual premise.

24

Because the copy of counsel's Code of Civil Procedure section 170.6 affidavit in the record is not file-stamped and there is no transcript of that date's hearing, the record does not show that defendant's motion was "filed . . . prior to the commencement of the probation violation hearing." It does not even show that counsel attempted to file the motion before the hearing. On this record, it is equally possible that counsel hand carried the motion to court and attempted to present it for filing after the hearing began, which would have been untimely even under the "general rule" defendant relies on (let alone under the exceptions to this rule enumerated in Code of Civil Procedure section 170.6, subdivision (a)(2), which would all have required filing the motion some days prior to the hearing).

Applying the presumption that official duty is regularly performed in the absence of record evidence to the contrary (Evid. Code, § 664), we conclude that Judge Balonon correctly found defendant's attempted filing untimely. Thus, counsel was not ineffective in failing to challenge this ruling by writ petition because such a petition would inevitably have been denied.

Since defendant cannot show that trial counsel's failure to seek writ review of Judge Balonon's ruling was incompetent, we need not address defendant's claim of prejudice arising from counsel's conduct. We note, however, that defendant's assertion he was reasonably likely to have been sentenced more leniently by some judge other than Judge Balonon is speculative and unpersuasive.

Judge Balonon imposed the upper term because aggravating factors (planning; taking advantage of a position of trust) outweighed mitigating factors (lack of prior record; early admission of wrongdoing). Given that defendant successfully concealed his sexual relationship with the victim for a year, and took advantage of the trust the victim's father rested in him as a person the father had known since childhood, the aggravating factors Judge Balonon relied on are amply supported. Moreover, the mitigating factor of early admission of wrongdoing is dubious at best: although defendant admitted what he

25

did, he never admitted it was wrong.  Under the circumstances, the only clearly mitigating factor, the lack of a prior record, counted for little.  We see no reasonable possibility that a different judge would have imposed a more lenient sentence.

DISPOSITION

The order revoking defendant's probation is affirmed.


                                        NICHOLSON     , Acting P. J.



We concur:



       BUTZ           , J.



       RENNER        , J.